BROOKSHIRE BROTHERS,
INC., Appellant,

v.

Carl Dean LEWIS, Appellee.

No. 09–97–295CV.

Court of Appeals of Texas,
Beaumont.

Aug. 26, 1999.

Submitted Feb. 18, 1999.

Decided Aug. 26, 1999.

**910**

Curtis W. Fenley, III, Fenley & Bate, LLP, Lufkin, for appellant.

Margaret Alexander, Conroe, David E. Keltner, Karen S. Precella, Jose, Henry, Brantley & Keltner, Fort Worth, Steve Young, John Tavormina, Helm, Pletcher, Bowen & Saunders, for appellee.

Before WALKER, C.J., BURGESS, and STOVER, JJ.

## OPINION

STOVER, Justice.

Carl Dean Lewis ("Lewis") sued his employer, Brookshire Brothers, Inc. ("Brookshire"), for injuries he sustained while working in the meat department of one of Brookshire's grocery stores. Trial was to a jury, and damages in the sum of $300,000 were awarded. Judgment was rendered by the trial court in favor of Lewis. Brookshire brings ten points of error on appeal. We will affirm.

Lewis began working for Brookshire in 1984. He was initially hired as a meat cutter and was later promoted to the position of head meat cutter and meat market manager. On July 9, 1990, while at work, he injured his back by lifting a sausage case. The injury consisted of a herniated disc requiring back surgery. On October 8, 1990, following his recovery from surgery, Lewis returned to work on light duty status. On June 10, 1991, he was given a release to return to full duty.

Shortly after being released to full duty, Lewis suffered a second back injury while putting meat into a meat grinder.[1] Lewis testified that on that day, Brookshire was having a sale on ground beef. The meat department was short on staff, and Lewis testified the employees had "picked up an enormous amount of lugs because [the store] sold a lot of ground beef, a tremendous amount."[2] Because of the second injury, Lewis suffered from a herniated disc and had to have a second surgery on September 24, 1991.

In January of 1992, Lewis returned to work on a "pencil and paper" light duty restriction. In February of 1993, thirteen months after he had returned to work, Lewis was experiencing severe pain. He was told by his doctors that he would need a third surgery. After the surgery, following his doctor's advice, he did not return to work.

## PROXIMATE CAUSE

We first consider points of error three, four, and five wherein Brookshire argues the evidence is legally and factually insufficient to support proximate causation.

### Standard of Review

"In reviewing the evidence under a no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998). The reviewing court is to determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *See id.* at 286; *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex.1998). The evidence presented, viewed in the light most favorable to the prevailing party, must permit the logical inference that the jury must reach. *See CAT Contracting*, 964 S.W.2d at 286.

In conducting a factual sufficiency review, an appeals court "must consider and weigh all of the evidence, not just that evidence which supports the verdict." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998) (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996)). The verdict can be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.; Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The court of appeals is not a fact finder. Accordingly, it may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence clearly supports a different result. *See Maritime Overseas*, 971 S.W.2d at 407; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986).

---

1. The record is unclear as to the actual date of the second injury. Lewis testified the date was either July 29, 1991, or August 6, 1991.

2. A "lug" is a plastic pan used to hold meat trimmings.

*Analysis*

Brookshire is a nonsubscriber under the Texas workers' compensation law. *See* TEX. LAB.CODE ANN. § 406.001–406.165 (Vernon 1996 & Supp.1999). Thus, it is responsible for work-related injuries under common law principles of negligence. *See Werner v. Colwell*, 909 S.W.2d 866, 868 (Tex.1995). To establish negligence, a plaintiff must produce evidence to establish a duty, a breach of that duty, and damages proximately caused by the breach. *See id.* at 869.

Although an employer is not an insurer of its employees' safety, the employer does have a duty to use ordinary care in providing a safe work place. *See Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex.1996); *Werner*, 909 S.W.2d at 869. This duty is non-delegable and encompasses a duty to provide rules and regulations for the safety of employees, to furnish safe machinery and instrumentalities, and to select careful and competent fellow servants. *See Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 923–24 (Tex.1981); *Kroger Co. v. Keng*, 976 S.W.2d 882, 885 (Tex. App.—Tyler 1998, pet. filed); *Woodlawn Mfg., Inc. v. Robinson*, 937 S.W.2d 544, 548 (Tex.App.—Texarkana 1996, writ denied).

"Proximate cause consists of cause in fact and foreseeability." *Leitch*, 935 S.W.2d at 118 (citing *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 755 (Tex.1975)). The test for cause in fact is whether the negligent act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred. *See Prudential Ins. Co. of America v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161 (Tex.1995); *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458–59 (Tex.1992). Cause in fact is not shown if the party's negligence did no more than furnish a condition that made the injury possible. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex.1995) (citing *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968)). "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries ... [and] justify the conclusion that such injury was the natural and probable result thereof." *Id.* (quoting *Carey v. Pure Distrib. Corp.*, 133 Tex. 31, 124 S.W.2d 847, 849 (Tex.1939)). "In other words, even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause." *Id.*

"Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996). The danger of injury is foreseeable if its "general character ... might reasonably have been anticipated." *See Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 551 (Tex.1985). "The foreseeability of a back injury in connection with regular lifting of heavy objects is judged by a reasonable person standard." *Leitch*, 935 S.W.2d at 119.

*Causation*

Brookshire argues there was no evidence to establish causation. Lewis testified he injured his back at work while he was dumping a lug of meat into a grinder. Dr. Arthur Evans, the surgeon who performed all three of Lewis' surgeries, testified that the history of heavy lifting was sufficient to make the correlation that Lewis injured his back at work. Timothy Kellerman, a meat cutter who worked with Lewis on a daily basis, was working with Lewis on the day of the second injury. He testified he was ten or fifteen feet away, "actually standing there watching [Lewis]." After lifting the lug, Lewis said to Kellerman, "Well, I blew my back out again...." From Lewis' expression, Kellerman could tell Lewis was in pain.

An accident report, made after the second injury, shows that Lewis injured his back while at work. The report, which was signed by store manager Jerald Johnson, states the "[m]arket was short handed

on accident date due to one man on vacation & one man quit that day without notice. [Lewis] had to work harder than usual & back became sore." The report additionally indicates the accident occurred by "lifting a lug of hamburger meat." In deposition testimony, Johnson again reported that Lewis was injured while grinding hamburger meat. Brookshire, in admissions read into the record at trial, admitted that Lewis' "back started hurting after picking up lugs of meat for the grinder."

*Foreseeability*

*Adequate Staffing*

As part of his negligence claim, Lewis alleged Brookshire did not have sufficient staffing in the meat department—an inadequacy which, Lewis claimed, was a cause of his injury and which made the injury foreseeable. In contrast, Brookshire contends Lewis' injury was not foreseeable because sufficient help was available, yet Lewis proceeded to do the work without asking for assistance. It additionally argues that it cannot be held liable for Lewis' injuries because Lewis was the manager of the meat department and held the responsibility of staffing and scheduling. *See, e.g., Allsup's Convenience Stores, Inc. v. Warren,* 934 S.W.2d 433 (Tex.App.—Amarillo 1996, writ denied) (where manager of store injured her back unloading packages from delivery truck, after worker who was scheduled to unload truck had failed to report to work, employer was not negligent because manager was solely responsible for scheduling).

An employer has "an obligation to provide adequate help under the circumstances for the performance of required work." *Werner,* 909 S.W.2d at 869. The employer is not liable, however, when help has been provided and an injury results from the actions of the employee who voluntarily proceeds to do the work without assistance. *Western Union Tel. Co. v. Coker,* 146 Tex. 190, 204 S.W.2d 977, 979 (Tex.1947). *See, e.g. Fields v. Burlison Packing Co.,* 405 S.W.2d 105 (Tex.Civ. App.—Fort Worth 1966, writ ref'd n.r.e.)

(employer not liable where worker voluntarily lifted tub of hamburger meat when help was available). Likewise, there can be no recovery on the theory that the number of employees was temporarily inadequate, unless it is shown that the inadequacy was known, actually or constructively, to the employer. *Western Union,* 204 S.W.2d at 979.

During the time period of Lewis' injury, the meat department had four employees who worked as meat cutters: Lewis, Kellerman, Quentin Northrup, and Alvis Bryant. In addition, the department was staffed with an apprentice and a meat wrapper. Randy Deal, Brookshire's meat merchandiser, had the responsibility of traveling to the various stores to consult with the meat market supervisors on scheduling. However, it was Lewis' responsibility, as the meat market manager, to determine the meat market's staff schedule. Lewis testified, however, that his manager determined the number of hours the employees worked.

If a situation arose where the meat department was short on help, Lewis would be required to ask for assistance. He would contact Deal who would make arrangements to find a replacement. Bryant testified that there were times when they were shorthanded and they would just do what they had to do to get the work done. Kellerman testified that if the department was short on help, "you [had] to do the work of another person." Store manager Johnson testified there were enough employees to handle the work load, and that employees would work overtime "if the sales were ... great."

On the day of Lewis' second injury, the meat department was inadequately staffed with less than the normal crew. Bryant was on vacation, and Northrup, without warning, quit his job and failed to show up for work on that particular day. As a result, the only meat cutters present at work were Lewis and Kellerman. Johnson testified that when Northrup failed to report to work, the meat department was

left shorthanded with no employees available to work in his place.

Although there is no evidence that Northrup's action in failing to report to work was foreseeable, there was evidence that the meat department was inadequately staffed prior to that particular day. Lewis testified the department was shorthanded prior to that day, and Bryant testified that Lewis had made requests for extra help. Deal testified he did not remember if Lewis complained to him that they were short of staff, and Johnson testified he did not remember discussing staffing with Lewis' supervisors until after the date that Northrup quit.

Following the second surgery, while on light duty status with doctor mandated restrictions, Lewis again made requests for additional help because his back was bothering him. The staff was not increased. Lewis testified he had to work in excess of his restricted forty hours per week and was sometimes required to lift in excess of the thirty-five pound weight restriction because of the lack of help. Lewis testified that he had spoken with Robert Gilmer, Brookshire's risk manager, about how they were putting too much work on him, and Gilmer told Lewis "he did not want to hear it." Lewis recalled a conversation he had with Johnson, in which Johnson told him he had spoken with supervisors about Lewis' need for more help and had informed them that Lewis "shouldn't [be] in the position because [he] had had a previous back surgery."

### Usual and Customary Duties

Brookshire also argues the injury was not foreseeable because Lewis "was performing functions and activities specifically within his job description and as a part of the normal duties of his position at the time of his injury." The activity of grinding meat, one of Lewis' job functions, was one that occurred numerous times a day, every day of the market's operation.

Brookshire cites *Great Atlantic & Pacific Tea Co. v. Evans*, 142 Tex. 1, 175 S.W.2d 249, 251 (Tex.1943) to support its argument that "[r]equiring an employee to perform customary work for a grocery store that the employee was accustomed to doing without injury is not negligence." In *Great Atlantic*, the Texas Supreme Court found that requiring a stock boy to carry sacks of potatoes weighing 100 pounds without assistance was not negligence where the employee was a "strong, robust, young man" and was merely required to perform work he had done for several months before this occasion. *Id.* The case at bar is distinguishable. The evidence reflects that the day of Lewis' second injury was not a typical, normal day. The store was having a sale on hamburger meat. One employee had failed to show up for work, leaving the meat department with only two meat cutters to supply the meat department with ground meat. Bryant testified that three people were adequate to run the market safely, but when they would have a hamburger sale, they would be "more busy than ever." Lewis testified they sold "an incredibly large amount of ground beef." He stated it was a "constant battle all day long."

### Safe Equipment

Brookshire additionally argues there was no evidence that the work required of Lewis was dangerous or that Brookshire should have anticipated any injury from the task assigned. An employer has a duty to provide its employees with a reasonably safe place to work and to furnish the necessary appliances or equipment to enable the employees to perform the work requested with reasonable safety. *See Harrison v. Harrison*, 597 S.W.2d 477, 482 (Tex.Civ.App.—Tyler 1980, writ ref'd n.r.e.); *J. Weingarten, Inc. v. Sandefer*, 490 S.W.2d 941, 944 (Tex.Civ.App.—Beaumont 1973, writ ref'd n.r.e.).

On the day of his second injury, Lewis was grinding hamburger meat. He stated he picked up a full lug, raised it up to the grinder, flipped it, and dropped the meat into the grinder. The lug was at face level when he flipped it. He immediately felt a sharp pain in his back.

The grinder in Brookshire's meat market was a Hobart mixer-grinder. Although Brookshire had never conducted an evaluation of the job activity of meat grinding, Gilmer testified the task did not pose an unreasonable risk, and the equipment was designed by the manufacturer with safety features built in. Deal testified this particular grinder is in every Brookshire market.

The process of grinding the meat, a one person task, begins with placing the meat trimmings into a plastic pan called a lug. The employee lifts the lug, leans over the grinder, and then flips the lug to drop the meat into the grinder. After going through the grinder, the ground meat falls into a second lug, which is placed on crates next to the grinder. The same batch of meat is usually ground twice. After the meat goes through the first time, the lug gets filled to the top, and the worker repeats the process of dumping the meat into the grinder.

William Purcell, a professional safety engineering consultant and certified safety professional, gave an additional description of the grinding process. He stated the actions in getting the meat into the grinder require repetitive movements. The worker bends down, reaches away from the body, grabs the lug, moving it horizontally to pick it up, stands up, raises the pan up as far as possible with his shoulders, changes the grip, and then raises the lug higher to dump the meat into the grinder.

The evidence varied as to how much a lug of meat would weigh. Although he was unsure of the exact weight, Lewis testified the lug he lifted when his back was injured was a full lug, weighing approximately sixty to seventy pounds. The accident report stated it weighed forty to sixty pounds. Kellerman testified a lug would hold forty to sixty pounds depending on the type of meat, but if the lug were full, it might weigh as much as seventy to seventy-five pounds. Johnson testified it would weight forty to sixty pounds when full. Deal testified it was a common procedure to dump a fuller lug into the grinder.

Bryant also stated lugs were usually filled to the top. Purcell testified that the maximum load for a safe lift, based on Lewis' size, would be twenty-seven pounds. He stated a full lug would weigh approximately sixty to seventy-five pounds, which would be approximately three times over a safe lifting limit.

Deal testified that in an average store, one and a half to two hours a day would be spent grinding. Johnson testified that twelve to sixteen lugs would be ground per day; the same person, however, does not necessarily do all the grinding. Johnson also stated that with a sale going on, an employee might lift a lug fourteen to sixteen times.

Purcell further testified the work Lewis was performing was unsafe. He stated that by reducing the size and volume of the lug, the risk would be reduced. He suggested a solution would be to "simply reduce the pan size ... so that the weight is controlled." Purcell recommended Brookshire could also make a platform for the worker to stand on so that he does not have to lift so high.

Although Purcell stated he did not have knowledge of a grocery industry standard for these particular lifting requirements, he was familiar with Kroger's 1991 standards. Kroger had a maximum lift limit of forty pounds, with the load being lifted between mid-thigh and the shoulders. Purcell stated it would have been very simple for Brookshire to reduce the risks associated with this task to a "nominal risk." He concluded that a prudent grocery store would have taken action to control the hazards associated with lifting above the shoulders.

Conversely, Brookshire's expert witness, Michael Frenzel, a board certified safety professional, testified the job site was a reasonably safe work place with "an acceptable level of risk." He testified that although the meat cutter position had an acceptable level of risk, it is not possible to engineer out every conceivable risk that is part of the job. He stated Brookshire had

identified and controlled the hazards associated with lifting the lug and grinding the meat with the application of engineering and administrative controls. Frenzel stated that one such engineering control was to reduce the weight of the lug. He testified the lugs used at Brookshire's have good handles, are a convenient size, and are not overly large. He estimated that a full lug would weigh approximately fifty-three pounds. He disagreed with Purcell's weight lifting limit of twenty-seven pounds, recommending instead a weight restriction of sixty-two pounds. However, with engineering and administrative controls, he opined that a maximum permissible weight limit of eighty-two pounds would be acceptable. In Frenzel's opinion, assuming Lewis was on full duty, "what [Lewis] was assigned to do was perfectly safe and in his capability to do."

Frenzel also testified that the method involved was not unsafe. He stated the activity of lifting a lug and putting the meat into the grinder, if done correctly, is not an unsafe activity. He explained how placing the lugs on top of crates to raise the lug higher resulted in less stress on the lifter. Although he admitted that Lewis hurt his back while "flipping" the lug, he stated that in doing so, Lewis did not breach common safety practices. He stated that flipping the lug poses minimal risk to the lower back. In his opinion, the greater risk is associated with bending to pick things up. Frenzel testified that from a safety standpoint it would be better to lower the top of the grinder; however, it would not necessarily reduce the risk because the worker would then have to stoop lower to collect the meat when it came out of the grinder.

Frenzel additionally testified that it was Lewis' responsibility to use judgment in assessing the weight of the lug and matching that weight to his lifting capabilities. In Frenzel's opinion, assuming full functional capacity, Lewis followed safe lifting practices; however, either he violated his restrictions or "he didn't assess his physical ability to handle the load based on his knowledge of his back on that day...."

*Safety Rules and Regulations*

■ Brookshire further asserts that Lewis' injury was not foreseeable because Brookshire had provided training to its employees, including proper instructions on lifting techniques, and had maintained a system of safety meetings to discuss and implement safety issues. An employer has a duty to establish and enforce safety rules so that an employee may perform assigned duties with reasonable safety. *See Sandefer*, 490 S.W.2d at 944. This duty includes a requirement to instruct employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities. *See Cabrera v. Delta Brands, Inc.*, 538 S.W.2d 795, 797 (Tex.Civ.App.-Texarkana 1976, writ ref'd n.r.e.).

Brookshire's safety program was implemented in 1990, prior to Lewis' first injury. This program consisted of a policy and procedure manual, an employee handbook, a safety poster program, safety videos, and weekly safety meetings. One video in particular gave instructions on proper lifting techniques. It pertained to store-wide safety, however, and did not specifically address the meat department.

Lewis testified he had attended Brookshire's safety meetings. He stated that although he had received training on proper lifting in general, the safety classes did not provide instructions on how to load meat into a meat grinder. Bryant also testified that the safety films did not have instructions or safety requirements for lifting a lug of meat and putting it into the grinder, nor had he seen any written safety rules specifically regarding lifting the meat.

Deal testified that employees were given general instructions on using back supports and "lifting with your legs." Gilmer testified the written safety rules were general safety warnings instructing the employees to stay alert to any situation that might become a safety hazard. He testified there were no written safety rules regarding lifting. He stated the safety

video the employees were required to watch dealt with lifting in general. It did not address lifting meat into a meat grinder. Gilmer stated that although he had conducted a review of the meat department, the company had never conducted an analysis of the risks associated with lifting meat to a grinder.

Purcell testified that Brookshire's safety manuals, rules, and program did not address how an employee is to lift at or above the shoulder level. He stated that Brookshire should have provided its employees with warnings or instructions on how to lift the meat, and he did not find any evidence that they had done so. In Purcell's opinion, this was a hazard that should have been addressed by the store. Frenzel stated that the supervisors are responsible for safety, but "we have to trust and rely on the employee to do what he has been told to do and trained to do." Frenzel acknowledged, however, that Brookshire had no written instructions on lifting meat.

### Restrictions placed upon Lewis

Brookshire additionally complains that Lewis undertook the activities of the job despite the restrictions placed on him. After his first surgery, Lewis returned to work in October of 1990, on a light duty work restriction. In June of 1991, his doctor released him to return to full duty. Deal testified that a full duty release means an employee can do everything, including lifting a full lug. In July or August of 1991, shortly after Lewis received a full release, his second injury occurred.

Gilmer testified that Lewis failed to follow the restrictions placed upon him by Brookshire, which were more restrictive than those of the doctors. Although Gilmer could not remember exactly what those restrictions were, he did recall that he had given Lewis general instructions "to be careful." He testified it was difficult to keep Lewis within the restrictions and that Lewis did not exercise judgment based on the instructions he had. Deal testified that he "constantly" had discussions with Lewis about whether he was

following the restrictions, that he notified Gilmer of the problem, and that he had given Lewis a warning to follow his doctor's restrictions.

Lewis testified that prior to the second injury, he tried to stay within the guidelines of the restrictions; however when the work had to be done, there were times he exceeded the restrictions because he had to complete tasks when no one else was available to do them. Gilmer testified Lewis was a hard worker. Deal testified Lewis was respected for producing good products. He stated Lewis was "going to do the things ... that he needed to do." Johnson also testified that Lewis was conscientious and sometimes when he was on light duty he would "try to do more than he should."

In January 1992, following the second surgery, Gilmer informed Lewis that he was to report to work. Lewis testified that, at that time, he had not been released by his doctors, and did not feel he was ready to return to work. Placed on a "pencil and paper" light duty restriction, Lewis was told to manage the meat market, working only the hours he could tolerate. Following his return to work, his doctor released him for light duty on January 21, 1992. He was not to lift more than thirty-five pounds, not to work more than forty hours per week, and not to do any repetitive bending or stooping. Lewis testified these light duty restrictions were exceeded because of inadequate staffing.

### Summary and Conclusion

█ The evidence supports Lewis' theory that one of the causes of his injury was the result of an inadequate support staff. Furthermore, the evidence reveals the danger created by the inadequacy in staffing was foreseeable. Although the evidence of whether Lewis made requests for additional help is conflicting, the record reveals testimony from which a jury could determine that Brookshire had actual or constructive knowledge of an inadequate staff. Additionally, although Brookshire

contends the injury was not foreseeable because Lewis was responsible for scheduling, the evidence indicates his authority in that area had limitations. Lewis' ability to schedule employees was restricted by the oversight of Deal. Although Lewis had the responsibility of determining the employees' work schedule, he had no authority to increase their hours. In addition, he had no authority to hire new employees. If the department was short staffed, his only recourse was to contact Deal who would hire a new employee or borrow an employee from the meat department of another store.

The record contains conflicting evidence pertaining to the safety of the activity of grinding meat. There was ample evidence, however, from which the jury could infer that the activity was unsafe. The weight of a full lug, the height of the grinder, and the effect of "flipping" the lug, were all associated with an increased risk of injury. The lack of specific lifting instructions pertaining to the meat department, and grinding of meat in particular, further increased the risk of injury and made that risk foreseeable. *See, e.g., Truco Properties, Inc. v. Charlton,* 749 S.W.2d 893, 895–96 (Tex.App.—Texarkana 1988, writ denied) (where housekeeper was given only general lifting instructions, it was foreseeable that she might improperly lift a bucket used in performing her duties); *Cabrera,* 538 S.W.2d at 799 (employer was negligent in failing to specifically instruct employee of the manner in which to move sheet of metal).

Although the evidence regarding Lewis' restrictions was conflicting, there was ample evidence from which the jury could infer that Lewis was forced to exceed the restrictions imposed upon him because of the lack of an adequate support staff. Indeed, the testimony of Brookshire's supervisors, that Brookshire had placed restrictions on Lewis that were more restrictive than those of his doctor's, supports the inference that Brookshire was aware of the possibility of a subsequent injury.

The case of *Brookshire Brothers, Inc. v. Wagnon,* 979 S.W.2d 343 (Tex.App.—Tyler 1998, pet. filed), is factually similar to the case at bar. In that case, an employee of Brookshire's meat department injured his back while moving boxes of meat from a pallet to a cart. The employee claimed Brookshire failed to provide him with a safe workplace. *Id.* at 347. Brookshire asserted the injury was not foreseeable because the employee was performing his regular duties at the time of the injury. *Id.* at 349. Among the evidence that the *Wagnon* court concluded was sufficient to find a foreseeable injury was the following: expert testimony revealed the maximum permissible lift by the "strongest, best-trained worker" was 64.7 pounds; the combination of the weight of the box and the method of lifting posed a threat of injury; Brookshire should have reduced the weight of the boxes; a "team lifting procedure" should have been required; simple instructions would have reduced the risk of injury; the employee had not been trained with specific instructions on lifting; and the employee asked for additional help that was not provided. *Id.* at 349–50.

In *Werner,* 909 S.W.2d at 869, the Texas Supreme Court made it clear that even when an employee is performing regular duties, an act or omission by an employer may be actionable if the job itself is unusual or poses a threat of injury. The present case is a prime example. Although Lewis was performing a job function that was included in his normal, routine duties, the evidence supports an inference that the job posed a threat of injury. The following evidence supports an inference that a possible injury was reasonably foreseeable: the department was inadequately staffed; there was a sale on ground beef making the department extremely busy on the particular day of Lewis' injury; Lewis was never given specific instructions pertaining to lifting activities involved with the meat department; and the equipment Lewis used to perform his duties was not reasonably safe, specifically the lug weight and grinder height.

We find the evidence is legally and factually sufficient to support proximate causation. Viewing the evidence in a light most favorable to Lewis, the evidence supports the inference that a general danger was reasonably foreseeable to Brookshire. As the trier of fact, the jury is the sole judge of the credibility of witnesses and the weight attached to their testimony. *See Maritime Overseas,* 971 S.W.2d at 407; *Pool,* 715 S.W.2d at 634. Although there is conflicting evidence in this case, we cannot substitute our judgment for that of the jury. *Id.* Therefore, considering and weighing all the evidence, the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Brookshire's third, fourth, and fifth points of error are overruled.

### COMPARATIVE NEGLIGENCE

In its first point of error, Brookshire argues "the trial court erred in denying Brookshire's request to reduce the judgment by Lewis' portion of negligence." The trial court submitted a charge that asked the jury to determine the negligence, if any, of each party, and then instructed the jury to apportion the parties' respective fault. Fifty percent negligence was allocated to Brookshire and fifty percent to Lewis. The jury awarded $200,000.00 for past and future physical pain and mental anguish, and $100,000.00 for past and future physical impairment. Brookshire submitted a motion for judgment arguing that under Texas' comparative responsibility statute,[3] the damages assessed must be reduced by Lewis' portion of negligence. In its final judgment, the court did not reduce the $300,000.00 damage award. On appeal, Brookshire contends the trial court erred in not applying the jury's findings of comparative causation to reduce the award by Lewis' portion of negligence.

The Tyler Court of Appeals has recently addressed this specific issue:

In an action against a nonsubscriber, it is not a defense 1) that the employee was guilty of contributory negligence; 2) that the employee assumed the risk of injury or death; or 3) that the injury or death was caused by the negligence of a fellow employee. TEX. LAB.CODE ANN. § 406.033 (Vernon 1996). The employer may only defend the action on the ground that the injury was caused by an act of the employee intended to bring about the injury or while the employee was in a state of intoxication. *Id.* In other words, the employer's only defense may be that it was not negligent in causing the injury or that its employee was the sole proximate cause of the injury. *Holiday Hills Retirement and Nursing Center, Inc. v. Yeldell,* 686 S.W.2d 770, 775 (Tex.App.—Fort Worth 1985), *rev'd on other grounds,* 701 S.W.2d 243 (Tex.1985). The Worker's Compensation Act clearly seeks to exclude from jury consideration any issue submitting an employee's fault, negligence, or responsibility, other than sole proximate cause. We hold that *in an employee's suit against a nonsubscribing employer, comparative negligence is not applicable* and should not be submitted to the jury. *See Id.*

*Wagnon,* 979 S.W.2d at 347 (emphasis added). *See also Keng,* 976 S.W.2d at 892; *Torres v. Caterpillar, Inc.,* 928 S.W.2d 233, 237 n. 3 (Tex.App.—San Antonio 1996, writ denied) ("Since [appellee] was a non-subscribing employer, contributory negligence was not a defense, and, therefore, the trial court properly disregarded the percentage causation the jury attributed to [appellant's] negligence in awarding damages against [appellee]."); *Holiday Hills Retirement and Nursing Center, Inc. v. Yeldell,* 686 S.W.2d 770, 774–75 (Tex.App.—Fort Worth 1985), *rev'd on other grounds,* 701 S.W.2d 243 (Tex.1985) ("[I]n employees' suits against a non-subscribing employer to the Compensation law, compara-

---

**3.** Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.04, 1987 Tex. Gen. Laws 37, 40 (amended 1995) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 33.001 (Vernon 1997)).

tive negligence is not applicable and should not be submitted to the jury."). *But see Byrd v. Central Freight Lines, Inc.*, 976 S.W.2d 257 (Tex.App.—Amarillo 1998), *pet. denied*, 992 S.W.2d 447 (Tex.1999) (holding comparative negligence is an element of an employee's action against an employer who is not a subscriber to Workers' Compensation).[4]

We agree that in suits against an employer who is a non-subscriber to Workers' Compensation, comparative negligence is not applicable.[5] The trial court did not err in failing to reduce the award by Lewis' proportion of negligence. Brookshire's first point of error is overruled.

### OFFSET

Prior to the court's final judgment, Brookshire submitted a motion for judgment arguing it was entitled to an offset for funds paid to medical providers on Lewis' behalf and for payments paid

4. In denying Byrd's petition for review, the Texas Supreme Court stated: "We neither approve nor disapprove the lower court's dictum that 'comparative negligence is an element of a worker's non-subscriber action against the employer outside the [Texas Workers' Compensation] Act.'" *Byrd*, 992 S.W.2d at 448.

5. Because we hold comparative responsibility is inapplicable, we need not address appellee's cross-point.

6. Brookshire states the previous payments were established by stipulation. A "stipulation" is defined as "an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto." *Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex.1998). To be enforceable, the agreement must be in writing, signed, and filed as part of the record, or made in open court and entered of record. TEX.R. CIV. P. 11. Lewis asserts the record does not contain evidence of a stipulation between the parties. We agree. After a thorough review of the record, we find no evidence of a stipulation. The only document contained in the record is a printout summary showing medical and indemnity payments made by Brookshire on Lewis' behalf. This document was not admitted at trial, but was instead attached to Brookshire's motion for judgment which was filed subsequent to the

directly to Lewis for lost wage indemnity.[6] In its second point of error, Brookshire argues the trial court erred in denying its request.

An offset against damages "applies to prevent a plaintiff from obtaining more than one recovery for the same injury." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex.1991). The jury awarded zero dollars for lost wages and was not asked to award damages for medical expenses. Therefore, Lewis did not receive a double recovery. As such, Brookshire is not entitled to an offset.[7] Point of error two is overruled.

### EXPLANATORY INSTRUCTIONS

In its sixth point of error, Brookshire contends the trial court erred in refusing to submit certain explanatory instructions.[8] We review a trial court's refusal to submit a jury instruction under

the jury's verdict. As such, Lewis asserts Brookshire failed to prove facts necessary to support any right to an offset. *See Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex.1980). Because we find Brookshire is not entitled to an offset, we need not address this issue.

7. In *Byrd*, the Amarillo court of appeals affirmed the trial court's judgment wherein an offset credit for past medical expenses and lost wages was applied against damages awarded by the jury for future medical care and loss of future earning capacity. *Byrd*, 976 S.W.2d at 258–59. In denying Byrd's petition for review, the Texas Supreme Court stated, "Because of the offset, the court of appeals' judgment is correct." *Byrd*, 992 S.W.2d at 448. We conclude *Byrd* is inapplicable to our determination here because in that case the offset for "undisputed credits" was not challenged.

8. Lewis asserts Brookshire has failed to preserve error on the exclusion of some of the proposed instructions. We disagree. *See State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.")

an abuse of discretion standard. *See Thomas v. Oldham*, 895 S.W.2d 352, 360 (Tex.1995). The Texas Rules of Civil Procedure require a trial court to "submit such instructions and definitions as shall be proper to enable the jury to render a verdict." TEX.R. CIV. P. 277. "The trial court is given wide latitude to determine the propriety of explanatory instructions and definitions." *H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex.1998) (citing *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 256 (Tex.1974)).

■ When the trial court refuses to submit a requested instruction or definition, our review is focused upon the issue of whether the request was reasonably necessary to enable the jury to render a proper verdict. *See* TEX.R. CIV. P. 277; *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 405 (Tex.App.—Houston [14th Dist.] 1997, writ dism'd by agr.). Brookshire contends the following refused instructions were necessary:

> Once an employer has furnished a safe way for an employee to do a job, the employer has no duty to provide a second safe way.
>
> An employee cannot complain if an employer merely requires an employee to do the usual and customary work required of persons in his line of employment, or required by the character of the business in which he was employed.
>
> Where an employer has provided a safe means of accomplishing a task, it is unreasonable to foresee that an employee will choose to perform the task in an unsafe manner.
>
> An employer is not liable when it has provided help and injury results from the act of the employee in voluntarily proceeding to do the work without assistance. The same is true when sufficient help is nearby and available and the employee does the work alone without seeking or asking for assistance.

■ Brookshire argues that by permitting a broad form instruction of negligence without the above listed explanations regarding the respective duties of the employer and employee, the trial court improperly shifted the burden of proof to the employer. We disagree. The trial court's charge need not and should not burden the jury with surplus instructions. *See Acord v. General Motors Corp.*, 669 S.W.2d 111, 116 (Tex.1984). "The only function of an explanatory instruction in the charge is to aid and assist the jury in answering issues submitted." *Union Oil Co. of Cal. v. Richard*, 536 S.W.2d 955, 957 (Tex.Civ.App.—Beaumont 1975, writ ref'd n.r.e.). The trial court is required to give definitions of legal and technical terms. *Id.* at 958. Anything else, however interesting or relevant to the case in general, that does not aid the jury in answering the issues, must be excluded. *Id; see also Depriter v. Tom Thumb Stores, Inc.*, 931 S.W.2d 627, 629–30 (Tex.App.—Dallas 1996, writ denied).

The jury was properly instructed on the terms of "negligence," "ordinary care," and "proximate cause." The instructions proposed by Brookshire were surplus instructions and, as such, were properly excluded. We conclude that the trial court's refusal to instruct the jury with the above listed explanatory instructions was not an abuse of discretion. The instructions were not necessary for the jury to render a proper verdict. Point of error six is overruled.

## DAMAGES

### *Mental Anguish*

■ In its seventh point of error, Brookshire argues the evidence was factually insufficient to support the jury's damage award for mental anguish. Under a broad form submission, the jury awarded $200,000 for past and future physical pain and mental anguish. However, Brookshire's point of error attacks the mental anguish element only. It offers no supporting argument with regard to past and future physical pain.

■ When a damage issue is submitted in broad form, it is difficult to ascertain the amount the jury awarded for each element

of damages. *See Greater Houston Transp. Co., Inc. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.—Corpus Christi 1993, writ denied). Consequently, to successfully challenge a multi-element damage award on appeal, an appellant must address all of the elements and show the evidence is insufficient to support the entire damage award. *See Price v. Short,* 931 S.W.2d 677, 688 (Tex.App.—Dallas 1996, no writ); *Zrubeck,* 850 S.W.2d at 589. A failure to address an element of damages results in waiver of the sufficiency challenge. *See Price,* 931 S.W.2d at 688; *Haryanto v. Saeed,* 860 S.W.2d 913, 922 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *Zrubeck,* 850 S.W.2d at 589. Therefore, by failing to address each element of the damage award, Brookshire has failed to preserve error. Point of error seven is overruled.

*Past and Future Physical Impairment*

■ In its eighth and ninth points of error, Brookshire attacks the legal and factual sufficiency of the evidence to support the jury's damage award for past and future physical impairment.

Dr. Evans testified regarding Lewis' surgeries and resulting impairment. Lewis' first surgery, performed in August 1990, was for a partial laminectomy of a large disc herniation at the L4–5 segment on the right side. In August of 1991, following the second injury, an MRI revealed a new herniation at the same segment level, this time on the left side, along with a new small disc herniation at the L5–S1 segment on the left side. By September 1991, Lewis was experiencing pain in both legs and a second surgery was performed. In March 1993, Lewis was diagnosed with nerve root compression on the left side. He was found to have a recurrent extrusion of a disc fragment on the left side at the L5–S1 level which was the same disc herniation operated on in the second surgery. He also had new abnormalities at segments L2–3 and L3–4. A third surgery was performed to remove the extruded disc fragment.

At the request of Brookshire, Dr. Robert Fulford examined Lewis to determine limitations related to his back injuries. Dr. Fulford's description of Lewis' back condition contained the following comments:

> Prior to his third surgery, I saw the patient and we established he had multiple-level degenerative lumbar disc disease. It was thought because of this a fusion was not indicated because of disease above and below the area where he had his herniated discs.... The patient has persisted in having a lot of pain. He describes this as being constant pain which is worse with movements, such as standing, stooping, bending, or lifting. Even sitting after a period of time causes him to have increased pain. The pain is mainly in the back and into the left leg. It is really very severe when he first gets up in the morning. He has trouble mobilizing, but once he starts to move around he seems to have less discomfort. The patient currently is using [pain medication] which helps alleviate the pain but certainly does not take it away completely.... On occasion, his legs give out, and, on one of these occasions, he actually fell....

Dr. Fulford's notes also indicated that Lewis had a 14% lumbar range of motion impairment. Based upon the American Medical Association's *Guides to the Evaluation of Permanent Impairment,* Dr. Fulford concluded that Lewis had a "27% impairment of the whole person." Dr. Fulford also advised a weight lifting restriction of 20 pounds.

Dr. Evans offered the following addition to Dr. Fulford's impairment rating:

> [T]his patient has multilevel degenerative disc pathology on the lumbar spine which has been minimally improved with two lumbar operations. He is not a candidate for lumbar fusion because of the number of levels involved. He tried to go back to work after his first surgery, but developed progressive problems and was unable to continue. He

further developed an additional disc herniation which required additional surgery. This patient will have continued problems with his back. He has undergone an Impairment Rating evaluation through Dr. Fulford. His data on his range of motion indicates that he has significant impairment of range of motion of his back. This is, in part, what accounts for his relatively high impairment rating. I understand that Dr. Fulford, the orthopedist on the case, had indicated that the patient could function in an employment position where he was not required to lift anything heavier than 20 pounds. I am in agreement with this with the following addition. This patient has limited range of motion of the low back and any effort to stress his back with regard to range of motion will only increase his symptoms.

Dr. Evans acknowledged that Lewis' back will never be the same as before, and further stated that there was nothing further that could be done to improve Lewis' condition.

Using the sufficiency standards of review as set forth earlier in this opinion, we find the evidence was legally and factually sufficient to support past and future physical impairment. Viewing the evidence in the light most favorable to Lewis, the testimony of Drs. Evans and Fulford adequately establishes past and future physical impairment. In addition, considering and weighing all the evidence, the damage award is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Points of error eight and nine are overruled.

### Remittitur

In its tenth point of error, Brookshire argues the trial court erred in denying its request for remittitur made in its motion for new trial. A point in a motion for new trial is a prerequisite to a complaint of inadequate or excessive damages. Tex.R. Civ. P. 324(b)(4); *Hawthorne v. Guenther*, 917 S.W.2d 924, 937 (Tex.App.—Beaumont 1996, writ denied). In its motion for new trial, Brookshire argued the damages awarded should be reduced by the percentage attributable to Lewis' comparative negligence. On appeal, Brookshire now argues it is entitled to a remittitur because Lewis failed to prove his claim for future physical pain, mental anguish, and physical impairment. Thus, the request at trial and argument on appeal are dissimilar.

Brookshire's objection at trial does not comport with its complaint on appeal. See Tex.R.App. P. 33.1. As a result, this point has not been properly preserved for our review. See, e.g., *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 525–26 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.) (variance between amount of remittitur requested at trial and that on appeal resulted in waiver of issue on appeal). We overrule Brookshire's tenth point of error.

AFFIRMED.