In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00154-CR
______________________________


NIKISHA SHONTE NEAL, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 115th Judicial District Court
Marion County, Texas
Trial Court No. F12703


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION

            Nikisha Shonte Neal appeals the trial court's decision to adjudicate her guilt and sentence her
to five years' imprisonment for the offense of aggravated assault.


 In her brief to this Court, Neal
contends the trial court abused its discretion by finding true the allegations in the State's "Motion To
Adjudicate Guilt" and revoking her community supervision. Neal does not raise any issues that are
relevant to any stage of the proceedings following the trial court's decision to adjudicate her guilt.
            "A defendant may not appeal the trial court's determination to adjudicate an original offense
on violation of community supervision." Brown v. State, 79 S.W.3d 140, 141 (Tex.
App.—Texarkana 2002, no pet.); see Tex. Code Crim. Proc. Ann. art. 42.12, § 5(b) (Vernon Supp.
2004–2005).


 "The plain meaning of Article 42.12, § 5(b), is that an appellant whose deferred
adjudication community supervision has been revoked and who has been adjudicated guilty of the
original charge, may not raise on appeal contentions of error in the adjudication of guilt process." 
Brown, 79 S.W.3d at 141 (citing Connolly v. State, 983 S.W.2d 738, 741 (Tex. Crim. App. 1999)). 
            Neal's sole point of error challenges whether the trial court abused its discretion by
adjudicating her guilt and revoking her community supervision. Such a challenge is not cognizable
on direct appeal given the procedural history of this case. We, therefore, may not consider this
contention of error.
            We affirm the trial court's judgment.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          March 31, 2005
Date Decided:             April 1, 2005

Do Not Publish




 );
 }

 At the same time, he also sued
SunBridge Healthcare Corporation d/b/a SunBridge Care and Rehabilitation for Linden
("SunBridge") and Sun Healthcare Group, Inc. ("Sun") claiming vicarious liability, negligence, gross
negligence, violation of resident's rights, and injury to the elderly.


 Penny sought recovery of actual
and exemplary damages based on negligent treatment and care


 of his grandmother, Mrs. Penny. 
            The jury returned a verdict in favor of Penny: $1,000,000.00 in pain and suffering and
mental anguish, $496,934.00 for disfigurement, $496,934.00 for physical impairment, and $6,132.00
in funeral and burial expenses. 
            Judgment in accordance with the jury's verdict was signed June 13, 2003. Appellee filed a
motion for new trial or, alternatively, a motion for remittitur or to modify. This motion was
overruled by operation of law. Appellee also moved for judgment notwithstanding the verdict
(JNOV), and the trial court overruled this motion. 
I.         FACTUAL SUMMARY
            Mrs. Penny was a resident of the nursing home in Linden, Texas, operated by Sunbridge. 
Between November 2000 and February 12, 2001, she fell fourteen times at the nursing home. On
March 27, 2001, she and another resident were taken to a physician by one staff member of the
nursing home. Upon arriving at the physician's office, both residents were placed in wheelchairs. 
Mrs. Penny was left unattended in her wheelchair when the staff member went back to assist the
other resident. Mrs. Penny's wheelchair began rolling down the sidewalk at a rapid speed. A witness
saw that Mrs. Penny had a "real scared expression on her face." When the wheelchair veered off
the sidewalk, Mrs. Penny was thrown onto the concrete parking lot and suffered serious injuries. 
Four days later, she died from those injuries. 
II.       EXPERT TESTIMONY
            In their first point of error, Appellants contend that the admission of the testimony of Glenda
Joiner-Rogers, R.N., Ph.D., constituted harmful error that probably resulted in an improper
judgment. They argue that Joiner-Rogers was not qualified to render any opinion regarding the
standard of care applicable to Appellants, and further, that Joiner-Rogers' expert report failed to
disclose any opinion regarding the issue of the staffing of the facility at any time before or including
March 27, 2001.
A.        Admission/Exclusion of Evidence
            1.         Standard of Review
            The admission or exclusion of evidence is a matter committed to the trial court's discretion. 
See City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995). The appellate court
examines the entire record to determine whether the trial court committed error and whether that
error probably caused the rendition of an improper judgment. See Tex. R. App. P. 44.1(a); Alvarado,
897 S.W.2d at 754; Gee v. Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989).
            2.         Preservation of Error
            Appellants filed their pretrial motion to exclude expert testimony in which they argued that
Penny's testifying expert, Joiner-Rogers, was not qualified as an expert because she lacked the
necessary knowledge, skill, experience, training, or education regarding standards of care for nursing
homes or the transportation of patients. The trial court heard this motion before Joiner-Rogers'
testimony. At this hearing, Appellants reurged their argument regarding Joiner-Rogers'
qualifications and also argued that her opinions regarding alleged understaffing should be excluded
because those opinions were not disclosed before trial. 
            The grounds for Appellants' second argument, regarding Joiner-Rogers' testimony on
understaffing, appear to be two-fold. Initially, Appellants challenged the reliability of her testimony
on the staffing issue because she did not provide a basis for her opinion on such an issue: "[W]e
don't think she has a legal basis for some of her testimony, especially as it relates to the staffing
issue." Then, after the trial court's ruling on Appellants' motion to exclude, Appellants raised the
inadequacy of Appellee's discovery response: "[W]e don't want her testifying to anything beyond
what they've disclosed to us so far in discovery." 
            The trial court overruled Appellants' motion to exclude and allowed Joiner-Rogers to testify
on the standards of care applicable to Appellants and alleged breaches of those standards, including
the issue of understaffing. 
            3.         Applicable Law: Expert Qualification
            In a medical malpractice context, negligence and causation must be established through
expert testimony, not on mere conjecture, speculation, or possibility. See Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 876 (Tex. 2001); Hart v. Van Zandt, 399 S.W.2d 791,
792 (Tex. 1965).
            Rule 702 of the Texas Rules of Evidence governs the qualification of expert witnesses. A
witness offering expert testimony must be qualified by "knowledge, skill, experience, training, or
education." Tex. R. Evid. 702. The proponent of the expert testimony bears the burden of proving
that the witness is qualified under Tex. R. Evid. 702 and that the expert's testimony is relevant to
the issues in the case and is based on a reliable foundation. See E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549, 556 (Tex. 1995). 
            The trial court must make certain "that those who purport to be experts truly have expertise
concerning the actual subject about which they are offering an opinion." Broders v. Heise, 924
S.W.2d 148, 152 (Tex. 1996). A medical degree or license alone is not enough to qualify a person
as an expert as to every medical question. Id. Generally, experience in a specialized field does not
qualify a witness as an expert; the witness must possess "special knowledge as to the very matter on
which he proposes to give an opinion." Id. at 152–53. The offering party must establish that the
expert has knowledge, skill, experience, training, or education regarding the specific issue before the
court which would qualify the expert to give an opinion on that particular subject. Id. at 153.
            In order to evaluate Appellants' contention, we must measure the expert's expertise against
the particular opinion the expert is offering. See id. The same standards for qualification of a
physician expert also apply to a nurse testifying as an expert. Pack v. Crossroads, Inc., 53 S.W.3d
492, 505–07 (Tex. App.—Fort Worth 2001, pet. denied).
            In Pack, the plaintiffs sued a nursing home for negligence. In support of their claims, the
plaintiffs offered the testimony of nurse Alford on the issue of alleged deficiencies in care by a
nursing home. Id. at 505. Alford had experience in nursing home investigations, knowledge of
nursing home regulations, and academic and clinical training. Id. at 506. However, despite those
qualifications, the trial court excluded Alford's testimony, holding that she was not qualified to
testify as to the specific standard of care of a nursing home or the nursing home's breach of that
standard of care. Id. at 506–07.
            The Fort Worth Court of Appeals outlined Alford's qualifications: she received both a
nursing diploma and a Ph.D.; she had been a staff nurse and a clinical instructor in a licensed
vocational nursing program, the education director of a nursing school, and an assistant professor
of nursing at a university; she was a consultant with the Department of Justice to determine why
troubled government-operated nursing homes were unable to meet regulations; and she received a
fellowship in the American Academy of Nursing and the Honorary Nurse Practice Award from the
American Nurses Association. Id. at 506.
            Alford testified that her experience in nursing home practice included taking students to two
nursing homes under a geriatric practitioner program in 1978 in which students would provide the
total resident care, filling in for a registered nurse consultant for three weeks at a nursing home in
the late 1970s, consulting nursing homes on resident problems, and teaching aides in nursing homes. 
Id. at 506–07. Alford's work with the Department of Justice and Texas Department of Human
Services concerned nursing homes specifically and exclusively. Id. at 507. She had also written
many published works about nursing care in general and care within nursing home settings
specifically. Id. She testified that she worked with nurses in nursing homes to assess the conditions
of residents and develop a care plan to meet residents' needs. Id.
            Despite these credentials, the court of appeals pointed out that Alford had never worked as
a staff nurse or a charge nurse in a nursing home, that she had never been an administrator of a
nursing home, that she had never performed nursing functions or routine shift work in a nursing
home on a daily basis, and that she had not delivered healthcare for someone other than a relative
since 1991. Id. Therefore, the court of appeals concluded, the plaintiffs failed to establish that
Alford had particular expertise in the field of nursing home standards of care. Id. On that basis, the
trial court did not abuse its discretion in excluding Alford's testimony about standards of care for a
nursing home or the defendant's breach of those standards. Id.
            4.         Joiner-Rogers' Qualifications
            The first of two arguments relating to Joiner-Rogers' testimony involves her qualification as
an expert on the matter before the trial court. Specifically, Appellants argue that, since Joiner-Rogers was not qualified as an expert on the standards of care applicable to Appellants, the trial
court abused its discretion by admitting her testimony.
            Joiner-Rogers had been a registered nurse for twenty-six years and, at the time of trial,
currently divided her time between providing expert services and teaching nursing at the University
of Texas. She received her bachelor's degree from Memphis State University and earned her master's
and doctoral degree from the University of Texas at Austin. She is certified in the speciality of
gerontological nursing by the American Nurses Credentialing Center. 
            In 1975, Joiner-Rogers worked in the operating room of the City of Memphis Hospital. After
about a year, she then began working on the hematology/oncology floor at a Veteran's
Administration (V.A.) Hospital. From 1979 to 1981, she worked at Shelby County Healthcare
Center, a very large nursing home, where she held positions as supervisor of staff nurses, head nurse,
utilization coordinator of staff development, and infection control coordinator. She testified that her
responsibilities included training the nursing staff, utilization review to ensure compliance with
Medicaid guidelines, and monitoring infections. Joiner-Rogers then returned to work at the V.A.
Hospital to work on the nursing home care unit. She remained there until she was accepted to the
University of Texas. 
            While working toward her master's degree at the University of Texas-Austin, Joiner-Rogers
worked at Breckenridge Hospital, primarily in the cardiology unit and telemetry. She added that she
also took care of the elderly at Breckenridge. When she finished her degree, she became the director
of nursing at a nursing home for one year. She then took the position of utilization review examiner
at Seton Medical Center. 
            While completing her doctoral degree, she worked as a teaching assistant for clinical courses. 
In 1988, Joiner-Rogers earned her doctoral degree. Since then, she has served as a consultant in
nursing service administration and gerontological nursing. She also worked as an assistant to the
vice president for patient care services at St. David's Rehabilitation Center. She then joined the
faculty at the University of Texas in 1992 as a lecturer on the conceptual basis of aging. From
September 1994 through May 1997, Joiner-Rogers worked on a grant funded by the National
Institutes of Health, conducting surveys at nursing homes throughout Texas. The surveys examined
the financial, resident, and employee outcomes in relation to nursing management. 
            Since August 1997, Joiner-Rogers has been teaching again in the clinical area, focusing on
gerontological nursing care at the University of Texas. She explained that she takes her students into
the hospital or nursing home to perform actual care for the patients or residents. Joiner-Rogers
conceded that the last time she was actually employed by a nursing home was in 1990, and during
that time, she was on the floor only when needed. 
            Appellants argue that Joiner-Rogers' testimony shows only that she has some qualifications
in providing and teaching clinical nursing care and that she has only some qualification in giving
hands-on direct nursing care to a nursing home patient. Appellants contend the evidence fails to
show that Joiner-Rogers has "any education, training, or experience in nursing home administration
and management, including formulating, implementing, and enforcing polices and procedures,
budgets, or staffing criteria." They argue that the record shows no evidence Joiner-Rogers "had ever
been licensed or employed as a nursing home administrator, or in any management role beyond
supervision of nursing staff." 
            5.         Joiner-Rogers Was Qualified as an Expert
            First, there is an obvious and relevant distinction between Pack and the instant case. In Pack,
the appellants were challenging the exclusion of expert testimony. Id. at 505–07. Here, however,
we are reviewing the trial court's admission of expert testimony for an abuse of discretion. That
being said, under an abuse of discretion standard of review, we allow the same amount of deference
for the trial court's decision to admit the evidence here as the Fort Worth Court of Appeals allowed
for the decision to exclude in Pack.
            Second, Joiner-Rogers' qualifications indicate she has had more specialized experience and
training in the study and practice of nursing in a nursing home environment than did Alford in Pack. 
Specifically, the experience absent in Pack is shown in the record here. Joiner-Rogers worked as
a staff nurse and as a supervisor of staff nurses at Shelby County Healthcare Center. She also served
in other administrative positions. She served as director of nursing in a nursing home for one year. 
Additionally, she served as a consultant in nursing services administration and gerontological care. 
Her three years of grant work focused on administration and management decisions' effect on
resident care. The trial court did not abuse its discretion by admitting Joiner-Rogers' expert
testimony.
B.        Discovery Issue
            In their second argument related to Joiner-Rogers' testimony, Appellants argue that, even if
Joiner-Rogers was qualified to give expert testimony, her opinions regarding the issue of
understaffing should have been excluded due to the failure of Appellee to disclose those opinions
during discovery. This argument should be distinguished from the initial basis for excluding Joiner-Rogers' testimony on understaffing. Again, Appellants first challenged the reliability of the expert
testimony, arguing that Joiner-Rogers had no basis for her opinion on understaffing. It was not until
after the trial court overruled Appellants' motion to exclude Joiner-Rogers' testimony in terms of her
qualifications and reliability of her opinions that Appellants raised the issue of the adequacy of
Appellee's discovery response. 
            1.         Applicable Law: Scope of Discovery for Expert Opinions
            A party must disclose the following for any testifying expert:
(1) the expert's name, address, and telephone number;
(2) the subject matter on which a testifying expert will testify;
(3) the facts known by the expert that relate to or form the basis of the expert's
mental impressions and opinions formed or made in connection with the case in
which the discovery is sought, regardless of when and how the factual information
was acquired;
(4) the expert's mental impressions and opinions formed or made in
connection with the case in which discovery is sought, and any methods used to
derive them;
(5) any bias of the witness;
(6) all documents, tangible things, reports, models, or data compilations that
have been provided to, reviewed by, or prepared by or for the expert in anticipation
of a testifying expert's testimony;
(7) the expert's current resume and bibliography.
Tex. R. Civ. P. 192.3(e). Additionally, a party may request disclosure of any or all of the following
regarding any testifying expert:
(1) the expert's name, address, and telephone number;
(2) the subject matter on which the expert will testify;
(3) the general substance of the expert's mental impressions and opinions and
a brief summary of the basis for them, or if the expert is not retained by, employed
by, or otherwise subject to the control of the responding party, documents reflecting
such information;
(4) if the expert is retained by, employed by, or otherwise subject to the
control of the responding party:
(A) all documents, tangible things, reports, models, or data
compilations that have been provided to, reviewed by, or prepared by or for
the expert in anticipation of the expert's testimony; and
(B) the expert's current resume and bibliography; . . . . 
Tex. R. Civ. P. 194.2(f). A party has an ongoing duty to supplement or amend its discovery
responses:
If a party learns that the party's response to written discovery was incomplete or
incorrect when made, or, although complete and correct when made, is no longer
complete and correct, the party must amend or supplement the response:
(1) to the extent that the written discovery sought the identification of
persons with knowledge of relevant facts, trial witnesses, or expert witnesses,
and
(2) to the extent that the written discovery sought other information,
unless the additional or corrective information has been made known to the
other parties in writing, on the record at a deposition, or through other
discovery responses.

Tex. R. Civ. P. 193.5.


 The trial court must exclude evidence that was not disclosed in discovery:
A party who fails to make, amend, or supplement a discovery response in a timely
manner may not introduce in evidence the material or information that was not timely
disclosed, or offer the testimony of a witness (other than a named party) who was not
timely identified, unless the court finds that:
(1) there was good cause for the failure to timely make, amend, or
supplement the discovery response; or
(2) the failure to timely make, amend, or supplement the discovery
response will not unfairly surprise or unfairly prejudice the other parties.

Tex. R. Civ. P. 193.6(a).
            2.         Dates and Content of Joiner-Rogers' Expert Report, Deposition, and Testimony
            Joiner-Rogers' February 6, 2003, expert report detailed her opinion that SunBridge breached
the applicable standard of care by failing to provide adequate assistance and supervision to prevent
accidents, which directly caused Mrs. Penny's pain, suffering, and death. 
            At her deposition April 29, 2003, the following exchange occurred between Appellants'
attorney and Joiner-Rogers:
Q.. . . You talk about supervision problems, that they probably should
have had more than one person supervising the transfer. But there's no mention of
staffing problems. And I want to make a distinction. Or do you believe there's a
distinction?
 
A.I believe it's all a part of protecting her safety, which is an over --
overarching an opinion. That's just support. Specifically, staffing was not
mentioned, but it is a part of why I think these things have happened, as a part of the
failure to do fall prevention and to protect her safety.

Joiner-Rogers repeated these same opinions at trial without objection as to the adequacy of the
discovery response. Appellants cross-examined Joiner-Rogers regarding the basis for her opinions,
including her opinion that staffing played a role in Mrs. Penny's injuries. 
            3.         Appellants Waived Their Complaint as to Inadequate Discovery Responses
            Penny responds to Appellants' contention by arguing that Appellants waived any error
regarding the adequacy of discovery responses. In their written motion, Appellants do not raise the
issue of a failure to disclose Joiner-Rogers' opinion. Appellants initially only raised the issues that
Joiner-Rogers was not qualified and that she had not provided a sufficient basis for her opinions
regarding staffing. After the trial court overruled Appellants' Daubert


 motion, counsel stated, "[W]e
don't want her testifying to anything beyond what they've disclosed to us so far in discovery." and
"[W]e believe that they should be limited to what's in the depo and in that report. And they can't go
beyond, you know, bringing up all sorts of issues that she's never told us about or we haven't had
time to get prepared for." 
            If the complaining party is aware of the alleged inadequacies of discovery responses before
trial, the complaining party cannot wait until trial to raise the issue.


 Morua, 979 S.W.2d at 619–20;
Interceramic, Inc. v. S. Orient R.R. Co., 999 S.W.2d 920, 930 (Tex. App.—Texarkana 1999, pet.
denied). Appellants became aware of this alleged deficiency, at the latest, April 29, 2003, at Joiner-Rogers' deposition, but only raised the issue during trial right before Joiner-Rogers' testimony at the
June 4, 2003, hearing on Appellants' motion to exclude, based on other grounds. Appellants did not
reiterate their objection on this specific basis to Joiner-Rogers' testimony at trial.
            We conclude that Joiner-Rogers was properly qualified as an expert and that Appellants
failed to preserve the discovery issue for review. Accordingly, we overrule Appellants' first point
of error. 
III.      SUFFICIENCY OF THE EVIDENCE TO SUPPORT JURY'S FINDINGS AGAINST
SUN HEALTHCARE GROUP

            In their second point of error, Appellants contend the record contains legally or factually
insufficient evidence to support the jury's findings against Sun HealthCare Group, Inc., in response
to Questions 1 and 2.
A.        Standards of Review
            In reviewing the legal sufficiency of the evidence, we must consider all of the evidence in
the light most favorable to the prevailing party and must indulge every reasonable inference in favor
of the prevailing party. Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d 276, 285–86
(Tex. 1998). We will sustain a no-evidence point of error under any one of four scenarios: 1) the
record discloses a complete absence of evidence of a vital fact; 2) the court is barred by rules of law
or rule of evidence from giving weight to the only evidence offered to prove a vital fact; 3) the only
evidence offered to prove a vital fact is no more than a mere scintilla; or 4) the evidence establishes
conclusively the opposite of the vital fact. Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d
328, 334 (Tex. 1998). Any evidence supporting the jury's finding that is of probative value and that
is more than a scintilla is legally sufficient to uphold the jury's finding. Leitch v. Hornsby, 935
S.W.2d 114, 118 (Tex. 1996).
            When reviewing the factual sufficiency of the evidence, we must consider, weigh, and
examine all of the evidence for and against the jury's finding, bearing in mind that the jury is the sole
judge of the credibility of witnesses and is entitled to accept or reject any testimony it wishes, as well
as decide the weight to be given to the testimony. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d
442, 445 (Tex. 1989). We will set aside the jury's verdict only when the evidence supporting the
jury's finding is so weak as to be clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986).
B.        Penny's Allegations Against Sun 
            In his petition, Penny alleged that Sun had a duty "to allocate its resources and exercise its
fiscal policies with reasonable care, so as to prevent the infliction of harm on the residents of nursing
homes operated by its subsidiaries." He alleged further that Sun "breached this duty by failing to
allocate sufficient financial resources to SunBridge Healthcare Corporation for residents' needs to
be meet [sic], resulting in harm to Pauline Penny as discussed throughout this Petition." The crux
of Penny's allegations against Sun, according to his brief, is that Sun knew resident care would suffer
if it did not provide enough money to properly staff the nursing home.


 
C.        Jury's Findings Against Sun
            The jury answered Question 1 affirmatively, finding that the negligence of each party
proximately caused the injuries to Mrs. Penny. The jury allocated responsibility in Question 2,
finding that Sun was seventy-five percent responsible and that SunBridge was twenty-five percent
responsible.
D.        Preservation of Error 
            Appellants moved for a directed verdict. Sun argued that there was not legally sufficient
evidence it owed a duty to Mrs. Penny, that there was no evidence Mrs. Penny had any expectation
Sun would provide for her care, and that there was legally insufficient evidence Sun breached any
duty owed to Mrs. Penny. 
            In its motion for JNOV, Sun argued specifically that the evidence was legally insufficient to 
support the jury's answers to Questions 1 and 2. In other words, Sun argued that the evidence was
legally insufficient to support the jury's finding that Sun had any direction or control over the staff
at SunBridge or the daily operations of SunBridge, particularly those operations concerning staffing
or budgeting. The trial court overruled Appellants' motions for directed verdict and for JNOV. 
Appellants argued the factual sufficiency of the evidence on each of these matters in their motion
for new trial, which was overruled by operation of law. 
E.        Applicable Law: Elements of Negligence of Action
            Penny sued Sun, as a corporate entity rather than a healthcare provider, for ordinary
negligence. Therefore, Penny was required to prove that Sun owed a duty, the breach of which
proximately caused injury to Mrs. Penny. See Southwest Key Program, Inc. v. Gil-Perez, 81 S.W.3d
269, 273–74 (Tex. 2002); Ortiz v. Shah, 905 S.W.2d 609, 610 (Tex. App.—Houston [14th Dist.]
1995, writ denied).
F.        Documentary Evidence of Sun's Control and Management of SunBridge
            Penny introduced several documents into evidence that demonstrate Sun maintained
significant control over its subsidiary, SunBridge. For instance, he introduced Sun's analyses of
SunBridge's revenue and expenses and Sun's detailed reports monitoring every hour worked by staff
at the Linden facility. He also introduced several other Sun reports detailing each SunBridge
expenditure. Additionally, the record contains Sun memoranda that demonstrate Sun's authority over
Sun expenditures. Specifically, Sun's "Cost Report" discussed in detail every function of
SunBridge's Linden facility operation. The "Cost Report" indicates that the CEO of Sun has "[d]irect
supervision of all financial and facility operations." 
 
G.       Summary of Testimony on Budgeting, Staffing Levels, and Impact of Shortages
            1.         Dr. Reginald LeGrow
            LeGrow was Mrs. Penny's treating physician and the medical director of the nursing home. 
He testified that corporations in the business of operating nursing homes have a responsibility to
allocate sufficient funds to provide staff to meet the needs of the residents. He testified that it was
vital to maintain a staff that could supervise nursing home residents who were at a high risk of
falling. 
            2.         Brenda Patterson
            Patterson worked for SunBridge for ten to eleven years. She acted as CNA coordinator. The
director of nursing directed her with respect to her duties to make certain there was enough staff at
the facility. She also ran the CNA budget. If she needed additional CNAs, they would have been
employed. There are procedures in place to call in temporary/emergency CNAs in the event of a
shortage. 
            Patterson explained that census, the population of the facility, dictates the number of CNAs
required. She was instructed to staff according to the State-mandated minimums. She heard
complaints that the facility needed more staff at least once a week. She went through the designated
channels to follow through on complaints, but was told to make do with what they had. It is not
clear, however, who gave her this instruction.
            Patterson testified that SunBridge offered the lowest pay in the area. She testified that she
understood Sun, rather than SunBridge, was her employer. When census would go down, Patterson
had to cut CNA hours. Patterson does not remember asking for a coworker to assist her during the
transport of Mrs. Penny and the other resident. She testified, however, that she would have liked to
have had help in the transport. The accident report cited "improper procedures" as the cause of the
accident. 
            By reference to the documents showing punch details, Patterson testified there were nine
CNAs and herself on duty the morning of Mrs. Penny's transport. According to Patterson, however,
not all CNAs worked on the floor during a shift. 
            3.         Julie Dillman
            Dillman, director of human resources for Sun, testified by deposition that she went to
SunBridge to audit the facility, to deal with employee issues, and to ensure that Sun was paying
employees correctly. She further testified that Sun would track labor hours at Sun's nursing homes
and would encourage any facility exceeding its budgeted hours to "get back within budgeted labor
hours." 
            4.         Linda Powell
            Powell, SunBridge's former payroll clerk from 1999 to 2001, testified she attended regional
meetings at which Sun repeatedly directed all the heads of the departments of regional facilities to
cut the budget. Throughout a given week, she faxed budget reports, nursing reports, and expense
reports to Donna Knight, the regional manager. She testified that SunBridge was in bankruptcy. 
            The facility was always short-handed. Powell described a high turnover rate among the
employees at the Linden facility. She testified that the district manager set staffing levels. It is not
clear, however, whether this was a Sun or SunBridge manager. She, too, testified that SunBridge
paid its CNAs less than most area facilities. Powell stated that Patterson expressed to Powell that
she was not able to find anyone to help her transport Mrs. Penny and the other resident on March 27,
2001, because the staff was short-handed. Powell conceded that staffing records indicate that ten
CNAs were on duty the morning Mrs. Penny was transported. 
            5.         Michael Berg
            Berg served as Sun's corporate counsel. He testified that revenue from the facility went into
an account over which both Sun and SunBridge had access and control. 
            6.         Glenda Joiner-Rogers
            Joiner-Rogers testified that having adequate staff is necessary to meet resident needs. When
staff is inadequate or incompetent, accidents and illnesses will increase. 
            7.         Darrell Smith
            Smith served as administrator at SunBridge's Linden facility from 1997 to 2001. He testified
there was never pressure to keep staffing below budget at the expense of resident care. He also
testified staffing and supply levels were adequate. 
            8.         Drema Thompson
            Thompson is SunBridge's regional manager for the region covering Texas, Oklahoma, and
Louisiana. Her testimony demonstrated that Sun was active in its financial and operational control
of SunBridge. She testified that, in the month before Mrs.Penny's fatal fall, the Linden facility
exceeded the budget for nursing expenses.


 The management team at SunBridge's Linden facility
would have been made aware that they were over budget in the few months preceding Mrs. Penny's
fall. The management, she explained, makes the decisions that impact resident care. 
            9.         Brenda Phillips
            Phillips was an LVN at SunBridge from March 25, 2000 to February 2, 2002. She testified
to the independent nature of Mrs. Penny. She also testified that the facility was constantly
understaffed, sometimes only having one or two aides. She complained to the director of nursing
about the staffing. Working conditions were poor in that the staff was paid poorly and the facility
did not maintain an adequate supply of hygiene and grooming products for the residents. Even if
sufficient help was hired, these conditions contributed to the high employee turnover rate at the
facility. 
            According to Phillips, these conditions had an effect on Mrs. Penny. Mrs. Penny would use
her call button to summon help, but after waiting for some time, she would try to get up on her own. 
This pattern would cause her to fall as she tried to get out of bed. Phillips recalled that it appeared
Mrs. Penny fell in her own urine on one occasion after no one came to her assistance. Phillips stated
that the only time the facility would have sufficient staff would be when the State came to evaluate
or investigate the facility. She stated that Patterson was devastated by the incident that was the cause
for this lawsuit and that Patterson told her that she had asked for help with the transport. She also
testified that the State investigated the SunBridge facility several times. Phillips stated she did report
the staffing and resulting care problems to the State several times. 
            10.       Jacqueline Jones
            Jones is a former CNA at SunBridge, having worked there on at least three occasions.


 She
worked during Mrs. Penny's stay at SunBridge. Jones testified that Mrs. Penny was known to get
out of her wheelchair and try to do things for herself. Staff was short-handed at least three times a
week. Jones complained to the director of nursing concerning the shortage of staff. Jones admitted
that she, as directed, went back to fill in blanks left in residents' ADL (Activities of Daily Living)
charts. 
            11.       Bruce Penny
            Penny testified that the family often took Mrs. Penny to her doctor's visits but were not
always able to do so. Beginning in January 2001, however, the nursing home occasionally indicated
that it had no one to take Mrs. Penny to regular doctor's visits and impliedly encouraged the family
to transport her. 
H.       Lack of Expert Testimony on Sun's Standard of Care and Breach
            Penny alleged that Sun failed to fulfill its duty to provide adequate funding to the facility and
that such failure was the proximate cause of the staffing shortages leading to Mrs. Penny's injuries. 
Penny presented Joiner-Rogers' expert testimony in support of his allegations against SunBridge, but
provided no expert testimony with respect to his allegations against Sun. He argues that expert
testimony was unnecessary since Sun was not a medical provider governed by the MLIIA. While
that is true, there is a more general inquiry into the necessity of expert testimony outside the medical
provider context.
            Expert testimony is necessary when the alleged negligence is of such a nature as not to be
within the experience of the layperson. Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982). The
question then becomes whether the law requires expert testimony by which the jury can evaluate the
allegations that Sun failed to provide adequate funding to maintain a staff sufficient to supervise the
residents.
            Put simply, we must decide whether a jury has the experience to evaluate corporate funding
of a nursing home and whether the funding was adequate to meet the residents' needs. Again, the
issue as to Sun's liability does not involve whether the staff was sufficient or whether another
employee should have accompanied Patterson while she transported Mrs. Penny and the other
resident. Rather, the issue concerns whether Sun was negligent in providing insufficient money to
SunBridge for staffing and, if so, whether such failure was a proximate cause of Mrs. Penny's injuries
and death.
            In some instances, expert witness testimony is not required to establish the standard of care
if the conduct involves nonmedical, administrative, or routine care. Golden Villa Nursing Home,
Inc. v. Smith, 674 S.W.2d 343 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (failure to
properly supervise a resident that darted onto a highway injuring the person colliding with him);
Sisters of Charity of the Incarnate Word, Houston, Tex. v. Gobert, 992 S.W.2d 25 (Tex.
App.—Houston [1st Dist.] 1997, no pet.) (patient in hospital sexually assaulted by a person with
well-known problems). In these instances, a jury is competent to determine and apply a reasonable
care standard.
            In contrast, this case involves corporate funding, nursing home budgets, and staffing level
standards—issues not within the common knowledge or experience of the jury.


 Without some
guidance as to how much money a reasonable parent corporation in the business of operating nursing
homes should have allocated to its subsidiary for staffing of the subsidiary's nursing home facilities,
the jury has no basis to establish a standard of care for Sun. Without such expert testimony, there
is no probative evidence that is more than a scintilla. Accordingly, we conclude that the evidence
supporting the jury's answers with respect to Sun is legally insufficient and render judgment that
Penny take nothing from Sun.
IV.      LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE TO SUPPORT
JURY'S AWARDS

            In analyzing Appellants' third point of error we are asked to determine whether the record
contains legally or factually sufficient evidence to support the jury's awards of $1,000,000.00 in
physical pain and mental anguish, $496,934.00 for disfigurement, $496,934.00 for physical
impairment, or whether the amounts should be remitted. Appellants ask us to review the evidence
to support the entire amounts awarded against both Sun and SunBridge.
A.        Standards of Review
            Appellants' argument that there is no evidence to support the jury's award raises the legal
sufficiency of the evidence. The contention that the jury's award was excessive raises the factual
sufficiency of the evidence to support the jury's award. See Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406 (Tex. 1998). 
            In determining whether damages are excessive, we apply the same test as for any factual
insufficiency question, examining all the evidence in the record to determine whether sufficient
evidence supports the damage award, remitting only if some portion is so factually insufficient or
so against the great weight and preponderance of the evidence as to be manifestly unjust. Torrington
Co. v. Stutzman, 46 S.W.3d 829, 851 (Tex. 2000); Ellis, 971 S.W.2d at 407; C.M. Asfahl Agency v.
Tensor, Inc., 135 S.W.3d 768 (Tex. App.—Houston [1st Dist.] 2004, no pet.).
            We recognize that the amount of damages to be awarded here is primarily a matter for the
jury to determine.


 No fixed rule exists for measuring these types of damages. Baptist Mem'l Hosp.
Sys. v. Smith, 822 S.W.2d 67, 78 (Tex. App.—San Antonio 1991, writ denied). Each case must be
measured by its own facts, and considerable discretion and latitude must be given to the jury's award. 
Weidner v. Sanchez, 14 S.W.3d 353, 372 (Tex. App.—Houston [14th Dist.] 2000, no pet.). In
considering and weighing the evidence, we must defer to the fact-finder as the final determiner of
the credibility of witnesses and the weight to give their testimony. See Ellis, 971 S.W.2d at 407. 
A verdict will be set aside on appeal only where the record clearly indicates that the award was based
on passion, prejudice, or improper motive, or is so excessive as to shock the conscience. Transit
Mgmt. Co. of Laredo v. Sanchez, 886 S.W.2d 823, 826 (Tex. App.—San Antonio 1994, no writ);
Weingarten, Inc. v. Gauthier, 305 S.W.2d 181 (Tex. Civ. App.—Beaumont 1957, no writ). As long
as sufficient probative evidence exists to support the jury's verdict, this Court will not substitute its
judgment for that of the jury. See Ellis, 971 S.W.2d at 407.
B.        Jury's Award for Physical Pain and Mental Anguish
            Question 3a of the jury charge asked the jury to award an amount for physical pain and
mental anguish as one element of damages. The jury established damages at $1,000,000.00 for
conscious pain and emotional pain, torment, and suffering experienced before death as a result of
the occurrence in question. Appellants argue there is legally and factually insufficient evidence to
support the jury's award.
            1.         Multi-Element Damage Award
            Damages for physical and mental injuries are separate and distinct. Southwest Tex. Coors,
Inc. v. Morales, 948 S.W.2d 948, 954 (Tex. App.—San Antonio 1997, no writ) (Green, J.,
concurring). Here, however, the jury charge included a question that concerned both "conscious
physical pain and emotional pain, torment, and suffering . . . ." When a damage issue is submitted
in broad form, ascertaining the amount the jury awarded for each element of damages is difficult,
if not impossible. See Wal-Mart Stores, Inc. v. Garcia, 30 S.W.3d 19, 24 (Tex. App.—San Antonio
2000, no pet.); Brookshire Bros. v. Lewis, 997 S.W.2d 908, 921–22 (Tex. App.—Beaumont 1999,
pet. denied). Therefore, an appellant who seeks to challenge a multi-element damage award on
appeal must address each element and show the evidence is insufficient to support the entire award. 
See Garcia, 30 S.W.3d at 24; Lewis, 997 S.W.2d at 922. If an appellant fails to address an element
of damages, the appellant waives the sufficiency challenge. See Garcia, 30 S.W.3d at 24; Lewis, 997
S.W.2d at 922. Here, Appellants challenge the evidence as to both physical and mental injuries to
Mrs. Penny. 
            2.         Pain and Suffering
            a.         Applicable law
            The presence or absence of pain, either physical or mental, is an inherently subjective
question. Dollison v. Hayes, 79 S.W.3d 246, 249 (Tex. App.—Texarkana 2002, no pet.). In Texas,
only pain consciously suffered and experienced is compensable. S. Pac. Transp. Co. v. Luna, 730
S.W.2d 36, 38 (Tex. App.—Corpus Christi 1987, no writ).
            The process of awarding damages for amorphous, discretionary injuries such as mental
anguish or pain and suffering is inherently difficult because the alleged injury is a subjective,
unliquidated, nonpecuniary loss. Dollison, 79 S.W.3d at 249. Because there are no objective
guidelines to assess the monetary equivalent to such injuries, the jury is given a great deal of
discretion in awarding an amount of damages it deems appropriate. Texarkana Mem'l Hosp., Inc.
v. Murdock, 946 S.W.2d 836, 841 (Tex. 1997); Dollison, 79 S.W.3d at 249.
            A party may establish the existence of conscious pain and suffering by circumstantial
evidence. Pain and suffering may be inferred or presumed as a consequence of severe injuries. City
of Austin v. Selter, 415 S.W.2d 489, 501 (Tex. Civ. App.—Austin 1967, writ ref'd n.r.e.).
            In some instances, the injuries are so substantial and the symptoms are so objective that an
award of damages for pain and suffering is clearly supported. Dollison, 79 S.W.3d at 249–50. In
other cases, the objective indicia of injury are either less obvious or entirely absent. The jury may
deny such damages if the injuries sustained are subjective in nature. Id. at 250; Blizzard v.
Nationwide Mut. Fire Ins. Co., 756 S.W.2d 801, 805 (Tex. App.—Dallas 1988, no writ).
            In Canales v. Bank of California, 316 S.W.2d 314, 318–19 (Tex. Civ. App.—Eastland 1958,
writ ref'd n.r.e.), the Eastland Court of Appeals found the evidence insufficient to sustain an award
for "conscious" pain and suffering of the decedent before his death. The court of appeals stated:
The only pain for which there can be a recovery is that which the child
consciously experienced, and events that occurred subsequent to a merciful
unconsciousness did not prolong nor increase the suffering and are not compensable.

Id. at 318 (citing Sharpe v. Munoz, 256 S.W.2d 890, 892 (Tex. Civ. App.—San Antonio 1953, writ
ref'd n.r.e.)).
            In Luna, the jury heard conflicting evidence on whether a fatally injured four-year-old boy
consciously suffered pain. 730 S.W.2d at 38. Objective medical evidence indicated that the boy was
not responsive to painful stimuli. Id. The father testified that his son was responsive to him at least
to a degree during his son's last weeks. Id. The Corpus Christi Court of Appeals held that the
father's testimony that the child responded by opening his eyes was certainly some evidence the child
was conscious and was able to experience pain. Id. 
            In Russell v. Ramirez, 949 S.W.2d 480, 491 (Tex. App.—Houston [14th Dist.] 1997, no
writ), there was no evidence the decedent ever regained consciousness from the time he was taken
from the accident scene until he died twelve days later. The only evidence of "conscious" pain and
suffering in the record is found in counsel's argument before the trial court concerning the
admissibility of the decedent's medical records, one of which made a reference to a motor response
of withdrawing from a painful stimuli. Id. at 491–92. The medical records were not part of the
appellate record, and there was no testimony as to the meaning of this neurological response and no
evidence that such a reaction was a conscious reaction to pain. Id. at 491.
            Since there was no evidence from any source that the decedent in Russell ever regained
consciousness or displayed any conscious signs of pain or suffering, the court of appeals found there
was no evidence to sustain the jury's finding that the decedent experienced conscious pain and
suffering before he died. Id. at 491–92. Therefore, the trial court's JNOV modifying the judgment
to eliminate the $50,000.00 jury award for the decedent's conscious pain and suffering was correct,
and the court of appeals affirmed the trial court's judgment. Id. at 492.
            b.        Evidence of Mrs. Penny's Pain and Suffering
            The record contains evidence of Mrs. Penny's pain and suffering as a result of her falls before
March 27, 2001. The record shows she fell at least fourteen times during her last nine months at
SunBridge. As a result of these falls, Mrs. Penny suffered bruises, open wounds, and tears to her
skin. Dr. LeGrow testified that skin tears can be painful and that he was certain Mrs. Penny
experienced some pain from the skin tears resulting from her falls. Penny testified that Mrs. Penny
cried as a result of one fall in the bathroom early in 2001. 
            Defense expert on nursing, Connie Cheren, testified that Mrs. Penny did not suffer any major
injuries as a result of her falls at the facility. She offered her opinion that skin tears are not
considered major injuries. Appellants also point to Mrs. Penny's mental deterioration to support their
contention that Mrs. Penny may have been unable to experience the sensation of pain from these skin
tears. 
            There is also evidence of Mrs. Penny's pain and suffering resulting from the fall March 27,
2001. Jody White, a clerk at the pharmacy attached to the clinic to which Patterson was taking
Mrs. Penny, witnessed the incident from the pharmacy window. White testified that Mrs. Penny
looked "real scared" as she traveled in the wheelchair alone at a high rate of speed. Mrs. Penny
veered off the sidewalk, fell onto the concrete head-first, then fell down the stairs leading into the
parking lot, where Mrs. Penny landed face-first. White testified that Mrs. Penny was bleeding
profusely from her nose. 
            Dr. LeGrow testified that, in some instances, a brain may be injured to the point at which
normal pain responses are not present. He could not say when or if Mrs. Penny lost pain perception. 
He stated that Mrs. Penny's loud moaning and picking at her sheets could be expressions of pain. 
He could not state that Mrs. Penny did not experience pain and suffering. 
            Mrs. Penny was crying after the fall. She was able to walk with help when she was admitted
to the emergency room March 27, 2001. On admission to the emergency room, Mrs. Penny was alert
and oriented. While in her hospital bed following the fall, Mrs. Penny moaned a great deal. She was
restless and attempted to pull the I.V. from her arm. The record indicates that she squeezed and held
onto Bruce Penny's hand.
            Appellants point to the nurses' overnight notes that indicated Mrs. Penny was in no acute
distress. Notes for the day following the fall reveal that Mrs. Penny was calm and that she did not
respond to verbal stimuli and only very little to painful stimuli. 
            Even though each case must be judged on its own unique facts, it is proper to consider other
approved awards in similar cases to determine if an award for pain and suffering is excessive. 
Landreth v. Reed, 570 S.W.2d 486, 492 (Tex. Civ. App.—Texarkana 1978, no writ). Recently, the
Amarillo court has considered the excessiveness of damages for claims resulting from an elderly
woman's injuries and death originating in a nursing home. Cresthaven Nursing Residence v.
Freeman, 134 S.W.3d 214 (Tex. App.—Amarillo 2003, no pet.). There, a patient of the nursing
home fell July 4 and broke her legs. She died July 20 as a result of an untreated bladder infection. 
The jury awarded $4.5 million in damages for pain and mental anguish. The Amarillo court
suggested a remittitur of $3.5 million, making the approved award $1 million for pain and mental
anguish. 
            The duration of the pain and mental anguish is an important consideration. In this case,
Mrs. Penny lived four days after the injury of March 27, 2001. In Guzman v. Guajardo, 761 S.W.2d
506 (Tex. App.—Corpus Christi 1988, writ denied), a young boy was killed in an automobile
accident. He lived and endured severe pain for "at least fifteen minutes." Id. at 512. Additionally,
the court found that he was "terrified." An award of $600,000.00 was upheld. Likewise, in Wilhelm
v. Flores, 133 S.W.3d 726 (Tex. App.—Corpus Christi 2003, pet. filed), an award of $1 million for
pain and mental anguish was upheld when a young man was stung by a bee, suffered anaphylactic
shock and died within thirty to fifty minutes. Another case on the issue of duration of pain is
Wellborn v. Sears, Roebuck & Co., 970 F.2d 1420 (5th Cir. 1992). Applying Texas law, the court
there held that damages of $1 million for a child's pain and suffering was not excessive when a
garage door closed on him, causing his death. The evidence established that he survived between
three minutes to several hours. 
            3.         Mental Anguish
            a.         Applicable law
            The Texas Supreme Court, concerned with the subjective nature of mental anguish damages,
has admonished courts to closely scrutinize such awards. Universe Life Ins. Co. v. Giles, 950
S.W.2d 48, 54 (Tex. 1997); Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995). In most
cases, plaintiffs may not recover mental anguish damages unless they introduce "direct evidence of
the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption
in the plaintiffs' daily routine." Giles, 950 S.W.2d at 54; Woodruff, 901 S.W.2d at 444. This
standard ensures that fact-finders are provided "with adequate details to assess mental anguish
claims." Giles, 950 S.W.2d at 54.
            Mental anguish damages must be supported by direct evidence of the nature, duration, or
severity of the plaintiffs' anguish, thus establishing a substantial disruption in the plaintiffs' daily
routine, or other evidence of a high degree of mental pain and distress that is more than mere worry,
anxiety, vexation, embarrassment, or anger. Saenz v. Fid. & Guar. Ins. Underwriters, 925 S.W.2d
607, 614 (Tex. 1996). In addition to evidence of compensable mental anguish, evidence must also
be presented to justify the amount awarded. Id. Juries must find an amount that fairly and
reasonably compensates for the loss. Id.
            Historically, some types of disturbing or shocking injuries have been found sufficient to
support an inference that the injury was accompanied by mental anguish. Woodruff, 901 S.W.2d at
445. Generally, qualifying events have demonstrated a threat to one's physical safety or reputation
or involved the death of, or serious injury to, a family member. Id.
            The court in Woodruff held that Parkway's negligence and the resulting property damage
could not alone support the mental anguish damages. However, we distinguish Woodruff from the
case at bar. At issue in Woodruff was the sufficiency of the evidence to show mental anguish when
the Woodruffs' house was flooded. The Woodruff court also held that there was no evidence, direct
or circumstantial, other than the fact of the flooding itself, to support an award of mental anguish. 
The Texas Supreme Court acknowledged that the flooding of the home certainly disrupted the
Woodruffs' lives temporarily, but concluded that, under substantive law, this type of disruption
would not support an inference that compensable mental anguish occurred. Id. 
            b.        Evidence of Mrs. Penny's mental anguish
            Penny testified that his grandmother cried as a result of an earlier fall and had grown scared
of the staff. White testified to the expression of fear on Mrs. Penny's face as she rolled alone in the
wheelchair. Additionally, Mrs. Penny's constant moaning and agitation during her final days indicate
she suffered mental anguish. Dr. LeGrow testified that Mrs. Penny cried in the parking lot after the
fall. 
            Appellants rely on Woodruff to support their contention that the evidence is insufficient to
support the jury's award for mental anguish. Woodruff actually lends more support to Penny's
position. Consistent with Woodruff, the severity of Mrs. Penny's fatal injuries is probably sufficient,
in and of itself, to support an inference that mental anguish accompanied those injuries. 
Additionally, the record contains other evidence that would support the jury's award, evidence that
was absent in Woodruff. Id.
            Many cases have held that consciousness of approaching death is a proper element to be
considered in evaluating mental suffering. See Yowell v. Piper Aircraft Corp., 703 S.W.2d 630,
634–35 (Tex. 1986) ($500,000.00 awarded to each of four decedents for mental anguish suffered
from the time a plane broke up until it crashed); Mo. Pac. R.R. Co. v. Lane, 720 S.W.2d 830, 833
(Tex. App.—Texarkana 1986, no writ) (argument that decedent was apparently killed instantly fails
to consider terror and consequent mental anguish in the six to eight seconds when he faced imminent
death). Here, the evidence shows that Mrs. Penny had a "real scared expression on her face" as she
was speeding down the sidewalk toward the concrete steps and parking lot. While it may not have
been as certain that she was staring death in the face as in a falling airplane, it is certainly reasonable
to conclude that she suffered real mental anguish as her wheelchair careened downhill in an
uncontrolled manner directly toward a concrete parking lot landing. In fact, she did suffer fatal
injuries from the incident. 
            After thoroughly reviewing the entire record, we cannot say that the jury's answer to the
damage issues concerning Mrs. Penny's pain and mental anguish are against the great weight and
preponderance of the evidence. We conclude that the evidence was legally and factually sufficient
to support the jury's award. The record does not clearly indicate that the verdict was so excessive
as to be based only on the jury's passion, prejudice, or improper motive. 
C.        Jury's Award for Disfigurement

            Appellants contend that there is no evidence of disfigurement before the March 27, 2001, fall
and that, therefore, the evidence is insufficient to support the jury's award. 
            1.         Applicable Law: Definition of Disfigurement
            Disfigurement has been defined as "that which impairs or injures the beauty, symmetry, or
appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms
in some manner." Goldman v. Torres, 161 Tex. 437, 341 S.W.2d 154, 160 (1960). Expert testimony
is not a prerequisite to the award of damages for disfigurement. Sanchez, 886 S.W.2d at 826. 
            2.          Evidence of Mrs. Penny's Disfigurement
            Photographs show a significant swelling, distortion, and discoloration of Mrs. Penny's face
and hands as a result of the March 27, 2001, fall. According to Penny, it appeared as though
Mrs. Penny also had bitten through her tongue or had bitten off part of her tongue. 
            Perhaps there is no evidence of disfigurement resulting from falls before March 27, 2001,
but the record does contain sufficient evidence of disfigurement resulting from the fall March 27,
2001. This fall represents one of the acts or omissions on which Penny bases his negligence claims. 
Therefore, there is some probative evidence to support an award for disfigurement. See id. at 824
(a discoloration on one's face is sufficient evidence for award for disfigurement). However, the
damages for disfigurement must be measured from the date of the injury until the time the
disfigurement is expected to end. See Armellini Express Lines of Fla., Inc. v. Ansley, 605 S.W.2d
297, 311 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.); Tex. Farm Prods. Co. v. Leva, 535
S.W.2d 953 (Tex. Civ. App.—Tyler 1976, no writ) (jury questions determine the past and future
disfigurement damages separately). Here, the duration of the disfigurement damages was only four
days. We cannot find that the evidence is factually sufficient to support an award of damages of
$496,934.00, and we suggest a remittitur for the disfigurement damages of $396,934.00. 
D.        Jury's Award for Physical Impairment
            The jury awarded Penny $496,934.00 for Mrs. Penny's physical impairment. Appellants
challenge the legal and factual sufficiency of the evidence to support this award.
            1.         Applicable Law: Definition of Physical Impairment
            In reviewing this point of error, an appellate court should consider all the evidence that bears
on this category of damages even if the evidence also relates to another category of damages. Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 773 (Tex. 2003). Physical impairment
encompasses the loss of the injured party's former lifestyle. Dawson v. Briggs, 107 S.W.3d 739, 752
(Tex. App.—Fort Worth 2003, no pet.). 
            2.         Evidence of Mrs. Penny's Physical Impairment
            There is evidence in the record that Mrs. Penny did participate in daily activities, although
she had lost some of her mobility and mental acuity. For instance, Penny testified that Mrs. Penny
would get up and around and liked to socialize with her friends in the nursing home. She also played
bingo and forty-two. She did have some level of mobility even when she was admitted to the
emergency room March 27, 2001. After she was placed in her room following the accident, she was
unable to speak or move about at all. She stayed in bed, moaning and tossing. According to Penny,
she was unable even to speak. Penny testified that the day following Mrs. Penny's fall, he went to
her hospital room where he took her hand and called her name. In response, Mrs. Penny looked at
him and attempted to say something to him, but could not because, it appeared, she had bitten her
tongue in half during the fall. 
            Once again, the limitation on this element of damages is not its severity, but its short
duration. Mrs. Penny was deprived of her ability to communicate or function in any meaningful
manner for four days before her death. Based on the short duration, we cannot find that the evidence
is factually sufficient to support an award of $496,934.00, and we suggest a remittitur of
$346,934.00.
V.        JURY CHARGE ERROR
            In their fourth point of error, Appellants argue that we are prevented from determining
whether the jury based its verdict on an invalid (i.e., on not supported by legally or factually
sufficient evidence) element of damages where the court's charge failed to limit the jury's
consideration only to the theories potentially supported by legally sufficient evidence of
disfigurement and physical impairment.
            Appellants complain of the trial court's submission of one damages blank for each of the
damages elements of disfigurement and physical impairment. They argue that, since there is no
evidence in the record to show any disfigurement or physical impairment before the March 27, 2001,
fall, commingling the falls before March 27, 2001, in one blank broad-form submission prevents
them from a meaningful presentation on appeal. They made the same objection to the trial court's
submission of the jury charge. 
A.        Standard of Review
            We review alleged charge error for an abuse of discretion. See Tex. Dep't of Human Servs.
v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).
B.        Applicable Law: Broad-Form Submission and Mixed Theories or Elements
            Whenever feasible, the trial court must submit jury questions in broad form. See Tex. R. Civ.
P. 277; Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 389–90 (Tex. 2000); E.B., 802 S.W.2d at
649.
            Appellants rely on Harris County v. Smith, 96 S.W.3d 230, 234 (Tex. 2002), to support their
point of error. In Smith, the trial court submitted a damages question with four elements of damages,
but with only one answer blank. Id. at 231–32. The Texas Supreme Court relied on Casteel, 22
S.W.3d 378, to hold that this submission was erroneous because the damages question mixed valid
and invalid elements of damages in a single broad-form question. Smith, 96 S.W.3d at 234. 
            A similar issue was presented in Columbia Medical Center of Las Colinas v. Bush ex rel.
Bush, 122 S.W.3d 835 (Tex. App.—Fort Worth 2003, pet. denied). The plaintiff pleaded specific
negligent acts by the defendant nurse and by the defendant medical center. Id. at 858. The Fort
Worth court noted that the specific acts at issue did not constitute separate theories of liability and
that Smith's reasoning did not apply. Id.
C.        Jury Charge Did Not Mix Valid and Invalid Elements of Damages
            Here, we rely on the same distinction as that noted in Bush. The acts or omissions before
March 27, 2001, do not constitute a theory of liability separate from the acts or omissions on
March 27, 2001. Penny sued on the acts or omissions creating a pattern of neglect of Mrs. Penny
while she was in the SunBridge facility. Therefore, the jury charge did not mix valid and invalid
elements of damages in a single broad-form question. We overrule Appellants' fourth point of error. 
VI.      PRE- AND POSTJUDGMENT INTEREST
            In their final point of error, Appellants argue that the trial court's award of pre- and
postjudgment interest at the rate of ten percent should be reduced to five percent pursuant to recent
amendments to Tex. Fin. Code Ann. § 304.103 (Vernon Supp. 2004–2005). House Bill 2415 or
House Bill 4 (or both), effective June 20, 2003, and September 1, 2003, respectively, adjust the
prejudgment and postjudgment interest from the rate of ten percent to the rate of five percent and
apply to final judgments signed or subject to appeal on or after the effective dates of the
amendments. At issue is the meaning of the phrase "subject to appeal" in the amendments. 
A.        Standard of Review
            Statutory construction is a question of law that we review de novo. In re Forlenza, 140
S.W.3d 373, 376 (Tex. 2004). The court must begin its construction with the statute's plain language
under the assumption that the Legislature tried to say what it meant and, thus, the words are the most
certain guide to the Legislature's intent. Bush, 122 S.W.3d at 865.
B.        Relevant Dates
            Judgment consistent with the jury's verdict was signed June 13, 2003. Appellants' notice of
appeal was filed September 8, 2003. 
C.        Applicable Law: Recent Amendments to the Texas Finance Code
            House Bill 4 and House Bill 2415 amended Section 304.003(c) of the Texas Finance Code
to reduce the postjudgment interest rate from ten to five percent. See Act of May 24, 1997, 75th
Leg., R.S., ch. 1008, § 1, 1997 Tex. Gen. Laws 3091, 3435, amended by Act of June 2, 2003, 78th
Leg., R.S., ch. 204, § 6.01, 2003 Tex. Gen. Laws 847, 862 [H.B. 4], and Act of June 2, 2003, 78th
Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2096–97 [H.B. 2415] (current version at Tex.
Fin. Code Ann. § 304.003(c) (Vernon Supp. 2004)).
            Each bill provides that the changes made apply in cases "in which a final judgment is signed
or subject to appeal on or after the effective date of this Act." Act of June 2, 2003, 78th Leg., R.S.,
ch. 204, § 6.04, 2003 Tex. Gen. Laws 847, 862 [H.B. 4]; Act of June 2, 2003, 78th Leg., R.S.,
ch. 676, § 2(a), 2003 Tex. Gen. Laws 2096, 2097 [H.B. 2415].
            In Bush, the Fort Worth Court of Appeals interpreted the phrase "signed or subject to an
appeal on or after the effective date of the Act." Bush, 122 S.W.3d at 865. Applying the plain
meaning of this phrase to discern the intent of the Legislature, the court concluded that the
amendment applied to cases where a judgment is signed on or after the effective date of the act and
"to cases where a judgment becomes subject to appeal, i.e., capable of being appealed, on or after
the effective date of the Act." Id.
            Similarly, in City of Dallas v. Redbird Development Corp., 143 S.W.3d 375 (Tex.
App.—Dallas 2004, no pet.), the Dallas Court of Appeals considered the effect of the amendment
to Section 343.003 of the Texas Finance Code and concluded that the final judgment signed May 16,
2003, was "capable of being appealed" on that same day, which was not on or after the effective date
of the amendments. Id. at 388–89.
D.        Judgment Subject to Appeal Before Amendments
            We follow the same sound statutory construction as did the Fort Worth and Dallas courts. 
The trial court signed its final judgment June 13, 2003. Therefore, the judgment was capable of
being appealed that same day, before rather than "on or after" the earliest effective date of the
amendments, June 20, 2003. Accordingly, we overrule Appellants' fifth and final point of error,
leaving intact the ten percent pre- and postjudgment interest.
VII.     CONCLUSION
            We overrule Appellants' first point of error, holding that Appellee's expert was properly
qualified to testify in this matter and that Appellants' motion to exclude Appellee's expert testimony
and Appellants' argument at trial failed to preserve their complaint regarding the adequacy of
Appellee's discovery response. We sustain Appellants' second point of error challenging the jury's
finding that Sun was negligent in its funding of its nursing home facility. Without expert testimony
as to the standard of care applicable to Sun and as to Sun's breach of that standard, the jury was
without legally sufficient evidence to find that Sun was negligent in its allocation of funds to
SunBridge. Given the discretion that we must give to the jury's award, we hold that there is legally
and factually sufficient evidence to support damages for conscious pain and suffering and mental
anguish in the amount of $1,000,000.00 and, thus, overrule Appellants' third point of error. We grant
that portion of Appellants' third point of error and find that there is not factually sufficient evidence
to support the jury assessments of damages for disfigurement and impairment and suggest a
remittitur of $396,934.00 concerning the disfigurement damage and $346,934.00 concerning the
physical impairment damage. A new trial will be granted unless we are notified within fifteen days
of the date of this opinion that the Appellee has filed the remittitur as suggested. 
            We overrule Appellants' fourth point of error concerning broad-form submission of damages
in that this case does not involve submission of damages based on invalid theories of recovery or
invalid elements of damages. 
            Finally, we overrule Appellants' point of error challenging the trial court's imposition of ten
percent pre- and postjudgment interest. The amendments to the Texas Finance Code are not
applicable to the final judgment here, which was signed before the effective dates of the
amendments. 
            With respect to the jury's findings against Sun, we reverse the trial court's judgment and
render judgment that Penny take nothing against Sun. Sunbridge was found by the jury to be twenty-five percent responsible for the injuries sustained. If Penny, within fifteen (15) days from the date
of this opinion, files a remittitur of a total of $743,868.00 from the total damages, we will award
Penny a recovery of $314,033.00 (twenty-five percent of the total) in damages, plus prejudgment and
postjudgment interest. If Penny fails to remit as suggested, the judgment will be reversed and the
cause remanded for a new trial as to Sunbridge. In all other respects, we affirm the trial court's
judgment against SunBridge in favor of Penny.
 

                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          December 8, 2004
Date Decided:             March 11, 2005